# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 691 | **DATE** | AUG 28, 2002 |
| **CASE TITLE** | Robert Donnell    v    Peters Securities, Co., et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 10/22/02, at 9:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ **Memorandum opinion and order entered.**
**Accordingly, defendants' motion to dismiss is granted in part and denied in part. Plaintiff is directed to file an amended complaint by 9/18/02. Defendants' response is due by 10/9/02.   Joint status report is due by 10/9/02.**

(11) ■ For further detail see order attached to the original minute order.

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | **Document Number** |
| X | Notices mailed by judge's staff. | | AUG 29 2002 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | docketing deputy initials | | 8 |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| GDS | courtroom deputy's initials | | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT DONNELLI, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.   02 C 0691 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| PETERS SECURITIES CO., L.P., a limited | ) | |
| partnership, REUBEN PETERS, ROBERT G. | ) | |
| PETERS, C. TIMOTHY VLAHOS, STEVE | ) | |
| HELMS, CHRISTOPHER ROSMAN, CHRIS | ) | |
| RANDLE, STEVE STOYCHA and | ) | |
| JASON PERHACS, | ) | |
| | ) | |
| Defendants. | ) | |



## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Donnelli filed a five-count complaint against defendants Peters Securities

Co., LP ("Peters Securities"), Reuben Peters, Robert G. Peters, C. Timothy Vlahos ("Vlahos"),

Steve Helms ("Helms"), Christopher Rosman ("Rosman"), Chris Randle ("Randle"), Steve

Stoycha ("Stoycha"), and Jason Perhacs ("Perhacs"), seeking payment allegedly due to him

arising out of Donnelli's marketing efforts performed under an alleged oral agreement with

Peters Securities.  Donnelli asserts the following causes of action: breach of contract against

Peters Securities, Reuben Peters, Robert G. Peters, Vlahos, Helms, Rosman, Randle, Stoycha and

Perhacs (Count I); "quantum meruit for reasonable value of services" against Peters Securities,

Reuben Peters, Robert G. Peters, Vlahos, Helms, Rosman, Randle, Stoycha and Perhacs (Count

II); intentional interference with contract against Reuben Peters, Randle, Stoycha and Perhacs

(Count III); intentional interference with prospective economic advantage against Reuben Peters,

Randle, Stoycha and Perhacs (Count IV); and, an accounting against all defendants (Count V).

Before the court is defendants' motion to dismiss all claims pursuant to Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Based on the following, the court grants in part and denies in part defendants' motion.

## LEGAL STANDARD

In ruling on a motion to dismiss for failure to state a claim, the court considers "whether relief is possible under any set of facts that could be established consistent with the allegations." Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir.1992). A plaintiff's complaint will generally not be dismissed unless it is beyond doubt that under no set of facts would plaintiff's allegations entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to rule on its merits. *See* Gibson v. City of Chicago, 910 F.2d 1510, 520(7th Cir.1990).

## BACKGROUND

When considering a motion to dismiss, the court accepts the allegations of the complaint as true as well as reasonable inferences therefrom, and views these both in the light most favorable to the plaintiff. Travel All Over the World, Inc v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir.1996). Donnelli's allegations are set forth below.

Prior to August 1996, Donnelli was a market maker on the floor of the Chicago Board of Options Exchange ("CBOE"). In August 1996, Donnelli entered into an agreement with John Najarian ("Najarian"), the owner of Mercury Trading and a partner with Shamrock Investment Bank. Najarian, among other businesses, operated as a Third Market Maker ("TMM") through Mercury/Shamrock. A TMM is a person or entity that purchases buy and sell orders from securities brokerage firms, and trades out of these newly purchased positions.

2

Under the agreement between Donnelli and Najarian, Donnelli was to leave market making on the CBOE and become the marketing partner for Mercury/Shamrock. Donnelli agreed to attempt to develop order flow from large on-line brokerage firms such as E*Trade Securities, Inc. ("E*Trade") in return for a $5000 monthly consulting fee, all expenses, and 20% of the profit from the business generated from Donnelli's efforts. From September 1996 through January 1998, Donnelli continued to work for Najarian and worked on developing relationships with E*Trade and other firms.

In late 1997, as a result of Donnelli's efforts, E*Trade committed to send trades to Mercury/Shamrock and in January 1998 began sending orders. At about this time, Najarian lost interest in the TMM business and told E*Trade that he would no longer target them for clearing. Based on Najarian's statements, E*Trade stopped its order flow and, based on the substantial sum of time and money it spent establishing its operation for clearing securities trades for Najarian's TMM operation, E*Trade threatened to sue Najarian.

In an effort to continue business between Mercury/Shamrock and E*Trade, Donnelli searched for a broker/dealer to replace Mercury/Shamrock, contacted defendant Peters Securities, and spoke with defendant Randle.[1] Donnelli presented the business concept and strategy to Peters Securities, including financial information and projections. The proposed sale price of the business to Peters Securities was $250,000 plus a percentage of the trading profits on the business, and Donnelli's compensation would be $50,000 and a division of the prospective

---

[1] With regard to the individual defendants, Donnelli alleges that Reuben Peters controls Peters Securities in Chicago, as the managing general partner. Robert Peters, Vlahos, Helms and Christopher Rosman are "general partners and/or employees or agents" of Peters Securities, and Randle, Stoycha and Perhacs are "employees and/or agents" of Peters Securities.

3

trading profits. When Peter's Securities indicated an interest, Donnelli put Randle, Reuben Peters and Najarian in contact to work out the financial package.

During these initial discussions, Peters Securities and Reuben Peters agreed that 20% of the trading profits would be split evenly between Donnelli, Stoycha and Perhacs, whom Peters Securities would employ as traders. It was also initially agreed that Donnelli would receive another 5% of the profits, 5% would be paid to Najarian, E*Trade would receive 20%, and the final 50% of profits would go to Peters Securities. After these initial discussions, Donnelli negotiated with E*Trade to stop its process of suing Najarian in return for which, among other things, E*Trade demanded that Najarian could not be involved with the new Mercury/Peters TMM. In response to E*Trade's demand regarding Najarian, Peters Securities and Reuben Peters agreed Najarian would not be involved and that the 30% trading profits remaining above the 20% to E*Trade and 50% to Peters Securities, would be equally split among Donnelli, Stoycha and Perhacs.

In February 1998, Peters Securities purchased Mercury/Shamrock's TMM business. For the next two years, between February 1998 and 2000, Donnelli worked to build Peters Securities' TMM business. Instead of paying Donnelli 10% of the trading profits, however, Peters Securities began paying Donnelli only 8 1/3% of the profits, splitting 25% between the three traders instead of 30%. Peters[2] promised Donnelli that when the firm met its projections, Donnelli's profit distribution would be raised to "the agreed upon amount (i.e., a one-third split of 30%)" or higher, depending on the level of success. Donnelli acquiesced and accepted the 8 1/3% split in reliance on Peter's representations.

_____

[2]The complaint does not specify if it was Reuben or Robert Peters.

In the ensuing two years, Mercury/Peters continued to experience numerous systems problems that caused E*Trade to stop sending Mercury/Peters its business on at least two occasions. Donnelli continued to work with E*Trade to motivate them to continue sending Mercury/Peters its business. Donnelli also performed various other services for Peters Securities, including bringing in business from other smaller brokerage firms.

During the entire two year period--February 1998 through February 2000--Peters Securities paid Donnelli 8 1/3% of the profits from Peters Securities' TMM trading business. In February 2000, Donnelli's relationship with Peters Securities was severed allegedly as a result of certain intentionally malicious acts of Reuben Peters, Randle, Stoycha and Perhacs.

## DISCUSSION

Defendants have moved to dismiss all five counts of plaintiff's complaint for failure to state a claim. In response, in addition to arguments relating to the individual claims, plaintiff asserts that the court should deny defendant's entire motion as untimely pursuant to Fed.R.Civ.P. Rule 12(g).

## FEDERAL RULES OF CIVIL PROCEDURE RULE 12(g)[3]

Plaintiff originally filed his action in an Arizona federal district court where defendants filed a motion to dismiss for lack of personal jurisdiction and improper venue pursuant to Rule 12(b)(2) and (3), and a motion to transfer pursuant to 28 U.S.C. § 1406(a). Defendants did not file a Rule 12(b)(6) motion to dismiss at that time. The Arizona court concluded that it had neither general nor specific personal jurisdiction over the defendants. Finding that personal jurisdiction existed over the defendants in the Northern District of Illinois, however, the court granted defendants' motion to transfer to this court.

Generally, courts have denied defendants' attempts to file multiple pre-answer motions to dismiss, finding such motions contravene the purpose of Rule 12(g): to prevent litigants from interposing defenses in a piecemeal fashion and eliminate unnecessary delay at the pleading stage. *See generally*, Moore v. Ford Motor Co., 1994 WL 25822 at *2 (N.D.Ill. Jan. 26, 1994);

---

[3]Rule 12(g)-(h)(2) provides:

(g) Consolidation of Defenses in Motion. A party who makes a motion under this rule may join with it any other motions herein provided for and then available to the party. If a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted, except a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated.

(h) Waiver or Preservation of Certain Defenses.

(1) A defense of lack of jurisdiction over the person, improper venue, insufficiency of process, or insufficiency of service of process is waived (A) if omitted from a motion in the circumstances described in subdivision (g),

or (B) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course.

(2) A defense of failure to state a claim upon which relief can be granted, a defense of failure to join a party indispensable under Rule 19, and an objection of failure to state a legal defense to a claim may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits.

U.S. Fidelity & Guaranty Co. v. Jepsen, 1991 WL 249706 at *2-3 (N.D.Ill. Nov. 14, 1991).

Defendants respond that the current motion to dismiss was not intended for purposes of delay but to expedite resolution of the current matter, and that based on the merits of its jurisdictional and venue motions before the Arizona court, defendants felt that there was no reason to burden the Arizona court with the additional 12(b)(6) defenses.

In Strandell v. Jackson County, Illinois, 648 F.Supp. 126, 129 (S.D.Ill. 1986), denying the plaintiff's request to deny the defendants Rule 12(b)(6) motion filed after a previously litigated Rule 12 motion, the court quoted from 2A Moore's Federal Practice ¶ 12.22 at 12-102:

> Although the proper procedure for raising the [Rule 12(b)(6)] defenses now at issue is in a motion for judgment on the pleadings, 'since the objection [of failure to state a claim] is so basic and is not waived, the Court might properly entertain the second motion [to dismiss] if convinced that it is not interposed for delay and that the disposition of the case on the merits can be expedited by so doing.'

See also, Kincaid v. City of Anchorage, 100 F.Supp. 325, 327 (D. Alaska 1951), in which the court addressed the merits of a Rule 12(b)(6) motion filed after a fully adjudicated Rule 12(b)(7) motion, recognizing that in doing so it was disregarding the literal language of Rule 12(g). The court reasoned that the 12(b)(6) motion was not interposed for delay, that the motion addressed each of the causes of action, and that if the supporting grounds for such motion were valid, adjudication of the motion would "clearly expedite the disposition of the case on the merits."

After considering the parties' briefs, the reasoning in Strandall and Kincaid appears particularly applicable to the instant case. The court finds defendants' motion was not filed for the purpose of delay and that adjudication of the instant motion will narrow the scope of this matter, greatly expediting resolution of the case. Accordingly, the court will now turn to the merits of defendants' motion to dismiss.

7

## **BREACH OF CONTRACT**

Defendants move to dismiss Count I based on two arguments: 1) under Illinois law, no action for breach of contract can be brought for breach of an "at-will" employment contract with Peters Securities; and, 2) Donnelli does not allege that a valid contract existed between plaintiff and the individual defendants. Plaintiff in essence concedes the validity of defendants' second argument, asserting that a "clerical error" was made when the individual defendants were included in the "parenthetical characterization" of Count I as being filed against the individual defendants. Accordingly, the court grants defendants' motion to dismiss the individual defendants from the breach of contract claim alleged in Count I.

In response to Peters Securities' argument that no cause of action lies against it for breach of an "at-will" contract, Donnelli argues that the contract was not an "employment contract" and that Count I states all the essential elements of a breach of contract claim. Before discussing the applicable law, the court notes that as pled, there are two parts to Donnelli's breach of contract claim against Peters Securities: 1) breach of defendant's oral contract to pay Donnelli a certain percentage of trading profits during the period that plaintiff actually worked for Peters Securities, i.e., February 1998 to February 2000; and, 2) breach of the oral contract arising from the termination of the alleged oral contract with Donnelli and the resulting failure to pay Donnelli profits after the termination date.

Under Illinois law,[4] to state a claim for breach of contract Donnelli must allege: 1) the existence of a valid contract with Peters Securities; 2) Peters Securities' breach of that contract; 3) Donnelli's performance under the contract; and, 4) damages to Donnelli resulting from such breach. *See*, Owen Wagener & Co. v. U.S. Bank, 697 N.E.2d 902, 906 (Ill. App. Ct. 1998). It is also well-established Illinois law, however, that "[c]ontracts of indefinite duration are terminable at the will of either party." Jespersen v. Minnesota Mining and Manufacturing Co., 700 N.E.2d 1014, 1016 (Ill. 1998).

While the cases cited and discussed in defendants' brief all relate to employment contracts, the Illinois Supreme Court in Jespersen applied the rule that a breach of contract claim cannot arise from the termination of an at-will contract to a sales distribution agreement, noting that the rule that "contracts of indefinite duration are terminable at will" has long been followed in Illinois. *Id.* at 1017. The court further noted that Illinois courts have applied this rule to a variety of types of contracts including employment contracts, credit card agreements, money market fund accounts and sales contracts. *Id.*

Under this rule, either party to the contract can "terminate the agreement for any reason or no reason without committing a breach of contract." *Id.* (affirming judgment dismissing plaintiff's complaint alleging defendant breached sales distribution contract by terminating it, for failure to state a cause of action for breach of contract); *see also*, O'Brien v. Omni Pro Electronics, Inc., 1996 WL 459853 at *4 (N.D.Ill. Aug. 13, 1996) (where contract did not specify

---

[4]The parties have not raised a choice of law issue and, because both parties rely on Illinois law in their briefs, the court will apply Illinois law. Wood v. Mid-Valley Inc., 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits.").

duration, court dismissed plaintiff's claim that defendant breached the contract by failing to pay him the remainder of his annual salary and commissions after the defendant terminated the plaintiff's employment).

Donnelli's complaint does not allege that the oral contract between Peters Securities and him provided for a specific duration of the contract. The court finds that under Illinois law, Donnelli has failed to allege a breach of contract based on Peters Securities' termination of the contract and subsequent failure to pay Donnelli any profits after February 2000. Construing the allegations in Count I most favorably in Donnelli's favor, however, the court finds Count I arguably[5] states the elements of a breach of contract claim for failure to pay Donnelli the proper amount as agreed upon under the terms of the alleged oral contract for his services during the contract's duration.

Accordingly, the court grants defendants' motion to dismiss Donnelli's breach of contract claim based on termination of the contract and his request for damages based on a failure to pay Donnelli profits beyond February 2000, but denies defendants' motion to dismiss Count I against Peters Securities for failure to pay Donnelli the profits allegedly due during the period Donnelli performed services for Peters Securities, February 1998 to February 2000.

---

[5]It is unclear under the allegations in plaintiff's complaint whether Peters Securities affected a valid unilateral modification of the terminable at will contract with Donnelli with regard to his remuneration, and whether Donnelli in turn acquiesced in and ratified such modification by continuing to work under the contract under Peters Securities' modified terms. *See*, <u>Bass v. Prime Cable of Chicago, Inc.</u>, 674 N.E.2d 43, 50-51(Ill. App. Ct. 1996) (cable operator's discontinuance of formerly free television guide unless customer paid fee was valid permissible modification of terminable at-will contract which was supported by sufficient consideration through company's continued service to customer under new terms: "[a] contract without a specified duration is terminable at will by either party [and] ... may be unilaterally modified").

## QUANTUM MERIUT

Defendants move to dismiss Count II because, (a) Donnelli's *quantum meruit* claim

alleges a valid contract between the parties, and (b) his allegation acknowledging receipt of some

compensation from Peters Securities during the years he performed marketing services is fatal to

asserting a *quantum meruit* claim. To state a claim for *quantum meruit*, Donnelli must allege: 1)

he performed a service to benefit Peters Securities and the individual defendants; 2) he

performed the service non-gratuitously; 3) defendants accepted this service; and, 4) "no contract

existed to prescribe payment of this service." Owen Wagener & Co. v. U.S. Bank, 697 N.E.2d

902, 908 (Ill. App. Ct. 1998); Canel and Hale, Ltd. v. Tobin, 710 N.E.2d 861, 868 (Ill. App. Ct.

1999).

In the general allegations of his complaint, Donnelli alleges that he entered into a contract

with defendants and that there were specific payment terms within the contract. This contract is

alleged not only in the preliminary paragraphs of his complaint, incorporated by reference in

Count II, but is further alleged in ¶ 34 of Count II, which states: "[w]hile Robert Donnelli was

performing these services, Robert Donnelli and these defendants expected that Robert Donnelli

would be paid the agreed upon and reasonable value for those services." Accordingly, plaintiff

has failed to state a claim for *quantum meruit* because he has pled the existence of a contract for

the services for which he claims *quantum meruit* damages. The court therefore grants

defendants' motion to dismiss Count II of the complaint.

The court notes that there is language in Illinois Supreme and Appellate court cases that

support dismissal of Count II based Donnelli's allegation that he was paid some compensation

for his services, i.e., Peters Securities' payment of 8 1/3% of the profits over the course of the

period Donnelli performed services for Peters Securities. In <u>First National Bank of Springfield v. Malpractice Research, Inc.</u>, 688 N.E.2d 1179, 1185 (Ill. 1997), while finding the plaintiff was not entitled to recovery under a *quantum meruit* claim because it failed to establish that its activities conferred any benefit on the defendants, the Illinois Supreme Court stated (*emphasis added*):

> *Quantum Meruit* means, literally, "as much as he deserves." ... A party seeking recovery on a *quantum meruit* theory must demonstrate the performance of services by the party, the conferral of the benefit of those services on the party from whom recovery is sought, and the unjustness of the latter party's *retention of the benefit in the absence of any compensation.*

*See also*, <u>Owen Wagener & Co.</u>, 697 N.E.2d at 1053 (*citations omitted*) (*emphasis added*)("The basis for *quantum meruit* recovery is equitable: '... receipt by a defendant from a plaintiff of a benefit which is unjust for him to *retain without paying for it* '").

Donnelli alleges in his complaint that Peters Securities did in fact pay him for his services, just arguably not as much as Donnelli was entitled to under the alleged oral agreement between the two parties. The parties did not cite, nor did the court find, a single case directly on point addressing this issue or a case in which a party was paid some form of compensation and yet was entitled to further recovery under a *quantum meruit* claim. Based on the court's finding that Donnelli's reliance on the terms of his alleged oral contract bars his *quantum meruit* claim, and the lack of controlling precedent on this issue, the court declines to reach the issue of the effect of Donnelli's payment for his services in ruling on the motion to dismiss Count II.

## TORTIOUS INTERFERENCE WITH CONTRACT

Defendants move to dismiss Donnelli's claim for tortuous interference with contract, asserting that such a cause of action cannot be asserted based on a contract that is terminable at will. As set forth by defendants, "[u]nder Illinois law a plaintiff cannot bring an action for

12

tortuous interference with contractual relations based on a contract that is terminable at will."
3Com Corp. v. Electronics Recovery Specialists, Inc., 104 F.Supp.2d 932, 937 (N.D.Ill. 2000).
The case defendants cite for this proposition, Hoskins v. Droke, 1995 WL 318817 (N.D.Ill.
May 24, 1995), addresses an employee's claim based on alleged interference with his
employment contract causing the plaintiff's termination. Plaintiff argues, without authority, that
such law applies only to employment contracts and that his claim is not based on an employment
agreement.

In 3Com Corp., 104 F.Supp.2d at 937, however, the court applied this rule of law to the
plaintiff's claim alleging that the defendant tortiously interfered with the agreement between the
plaintiff seller of scrap materials and the buyer of the scrap materials "by participating in the
scheme of understating the scrap's weight and value."[6] The case cited and relied on by the 3Com
Corp court for this legal proposition, Canel and Hale, Ltd. v. Tobin, 710 N.E.2d 861, 871 (Ill.
App. Ct. 1999), concerned a plaintiff's claim arising from the termination of a contract. In
Canel, the court held that an "action for tortuous interference with contractual relations is not the
proper vehicle for a discharged attorney seeking to recover damages," but rather the court should
re-classify such claim as one for intentional interference with prospective economic advantage.
Id.

Similarly, the Hoskins court, relied on the Illinois Supreme Court's decision in Fellhauer
v. City of Geneva, 568 N.E.2d 870 (Ill. 1991). In Fellhauer, 568 N.E.2d at 877, the plaintiff, a
former director of the Geneva City electric department, brought an action against the city's mayor

---

[6]The court did not dismiss the plaintiff's claim entirely, but held such claim must be classified
and considered under the standard applied to tortious interference with prospective economic
advantage claims. 3Com Corp., 104 F.Supp.2d at 937.

for various claims including intentional interference with contractual relations, alleging "that defendant Lewis embarked on a course of conduct intended to result in the termination of plaintiff's employment with the City of Geneva." Addressing the viability of this claim, the court noted a split among the Illinois Appellate courts on whether a plaintiff can prevail on this type of claim under the theory of tortuous interference with contractual relations, and determined that:

> an at-will employee such as plaintiff has no enforceable contractual right to employment and therefore cannot prevail under the theory of tortuous interference with contractual relations. Reasoning that an at-will employee may have a legitimate expectation of continued employment, however, the appellate court found that count III of plaintiff's amended complaint sounds in the tort of intentional interference with a prospective economic advantage.

Fellhauer, 568 N.E.2d at 877. Noting that the plaintiff did not challenge the appellate court's reclassification of his claim to one for tortious interference with a prospective economic advantage, the Illinois Supreme Court analyzed the court's ruling under that theory. *Id.*

In order to state a claim for tortious interference with contractual relations under Illinois law, a party must allege: 1) the existence of a valid and enforceable contract; 2) the defendants' knowledge of such contract; 3) the defendants' intentional and unjustified inducement of breach of the contract; 4) a subsequent breach by the other contracting party caused by defendant's wrongful conduct; and 5) damages resulting from such breach. *See*, R.J.N. Corp. v. Connelly Food Products, Inc., 529 N.E.2d 1184, 1190 (Ill. App. Ct. 1988).

The court finds that a reasonable interpretation of the holdings in Canel, Hoskins and Felhauer parallels the court's previous discussion separating Donnelli's ability to state a claim for breach of contract for Peters Securities' failure to pay the proper amount of profits due during the

14

period in which Donnelli performed services for Peters Securities, from his inability to state a viable claim for breach of an at-will contract based on the termination of such contract. Applied in the context of stating a viable claim for tortious interference of contract under Illinois law, the court finds that if the allegations in Donnelli's complaint allege the elements set forth in R.J.N. Corp, Donnelli can state a viable claim for tortious interference only with Peters Securities' alleged breach of paying the proper amount due during the time Donnelli performed services under the alleged oral contract, between February 1998 and February 2000. Based on the precedent set forth above, however, any tortuous interference based on acts allegedly causing Peters Securities to sever or terminate the contract with Donnelli cannot state a claim for tortious interference with contract and are therefore dismissed from Count III.

In the complaint, Donnelli alleges he had a valid, enforceable oral contract with Peters Securities to provide marketing and other services, and defendants Reuben Peters', Randle's, Stoycha's and Perhacs'[7] knowledge of such contract. Donnelli further alleges that these defendants "intentionally and with malice, caused defendant Peters Securities to breach its contract with Robert Donnelli by ... causing Peters Securities to not pay Robert Donnelli the amounts due under that contract ... because these defendants wanted to eliminate Robert Donnelli's participation in the profits of Peters Securities TMM business and to increase their share of the monies received from that business."

While Donnelli does not allege specific actions performed by each defendant, the court finds that for purposes of a motion to dismiss, the allegations as set forth are sufficient to state a

---

[7]Defendants Reuben Peters, Randle, Stoycha and Perhacs are the only defendants named in Counts III and IV.

cause of action for tortious interference with contractual relations. Accordingly, based on the preceding analysis, the court grants in part defendants' motion to dismiss the allegations in Count III relating to claims arising from the severance of Donnelli's contract with Peters Securities and the resulting damages therefrom. The court denies, however, defendants' motion to dismiss Donnelli's claim for intentional interference with contractual relations arising from the alleged conduct of the individual defendants allegedly causing Peters Securities to pay Donnelli less than he was entitled to under the contract between February 1998 and February 2000.

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Under Illinois law, in order to state a claim for tortuous interference with prospective economic advantage Donnelli must allege: "1) the existence of a valid business relationship or expectancy; 2) knowledge of the relationship or expectancy on the part of the interferer; 3) an intentional and malicious interference inducing or causing a breach of termination of the relationship or expectancy; [and] 4) resultant damage to the party whose relationship has been disrupted." Small v. Sussman, 713 N.E.2d 1216, 1223 (Ill. App. Ct. 1999). Defendants argue that Donnelli fails to adequately allege the first and third elements.

Defendants argue that under Illinois law, because of the at-will status of his contract, Donnelli fails to allege a reasonable expectancy of continuation of his contract. The cases cited by defendants are factually distinguishable and thus inapplicable.[8] In cases where the parties

---

[8]In Byker v. Sequent Computer Systems, Inc., 1997 WL 639045 at *12 (N.D.Ill. Oct. 1, 1997), addressing a motion for summary judgment, the court stated that an "at-will employee may possess a legitimate expectation of future economic advantage if he or she can establish there existed a presumption that his or her employment would continued indefinitely." The issue addressed in Byker, however, was plaintiff's failure to meet this element based on the fact that the plaintiff was demoted rather than terminated, and then voluntarily chose to resign following
(continued...)

16

have operated under an at-will contract for at least two years, courts have held such allegations are sufficient to meet the first element of a claim for tortuous interference with prospective economic advantage. *See*, 3Com Corp. v. Electronic Recovery Specialists, Inc., 104 F.Supp.2d 932, 937-938 (N.D.Ill. 2000) (holding complaint sufficiently pled a reasonable expectation of continued contractual relationship where plaintiff alleged the contractual arrangement had lasted for at least two years); Speakers of Sport, Inc. v. ProServ, Inc., 1998 WL 473469 at *3-4 (N.D. Ill. Aug 07, 1998), *affirmed*, 178 F.3d 867 (7th Cir. 1999) (denying summary judgment because genuine issue of fact remained regarding reasonable expectation based on two-and-a-half year business relationship: "Happy or not, it should be noted that Rodriguez had been with Speakers for the past two-and-a- half years despite his fickle relationship with previous agents.").

In Fellhauer v. City of Geneva, 568 N.E.2d 870, 878 (Ill. 1991), the court similarly rejected the defendant's argument that the plaintiff, a city employee who was originally appointed to his position for a specific term and while not reappointed continued beyond such term as a "holdover appointee," failed to allege the element of reasonable expectation in continued relationship, reasoning:

> This court ... has long recognized a legitimate expectancy in an employment
> relationship. "[W]here the contract is one of employment, it is immaterial
> whether it is for a fixed period or is one which is terminable by either party at
> will, both parties being willing and desiring to continue the employment under
> that contract for an indefinite period."

---

(...continued)
his demotion. In the other case cited by defendants, Williams v. Weaver, 495 N.E.2d 1147, 1152 (Ill. App. Ct. 1986), the court held that the plaintiff could not meet the first element based on the fact that it was undisputed that there was a written employment contract between the parties under which the plaintiff's employment was for a fixed one-year academic term, and he therefore had no reasonable expectation of employment beyond the one-year term.

In the instant complaint, Donnelli alleges an ongoing contractual relationship with Peters Securities spanning two years, during which time the contracting parties continued regardless of the fact that the main customer Donnelli brought to Peters Securities, E*Trade, withdrew its business on multiple occasions. For purposes of a motion to dismiss, the court finds such allegations are sufficient to meet the first element of his claim for tortuous interference with prospective economic advantage.

The court also rejects defendants' argument that plaintiff has failed to allege that the individual defendants, partners and employees of Peters Securities, acted for purely personal reasons unrelated to their employer's interest. The complaint alleges that Donnelli had developed substantial business for Peters Securities' TMM business and was in the process of bringing in more customers when his contract was severed based on the intentional and malicious acts of the individual defendants. This count also incorporates the previous allegations in the complaint, including that the individuals' acts in causing Peters Securities to breach its contract with Donnelli were done in furtherance of their own personal goal to eliminate Donnelli's participation in the profits of the TMM business "and to increase their share of the monies received from that business."

While Donnelli does not enumerate the acts taken by the individual defendants that caused the termination of his contract, for purposes of the instant motion to dismiss, the court finds Donnelli has sufficiently pled the elements of his claim for tortuous interference with prospective economic advantage. The court, therefore, denies defendants' motion to dismiss Count IV.

## ACCOUNTING

"In order to state a claim for accounting under Illinois law, a plaintiff must allege that he has no adequate remedy at law and one or more of the following: 1) a breach of a fiduciary duty; 2) a need for discovery; 3) fraud; or 4) the existence of complex mutual accounts." Firstar Bank, N.A. v. Faul, 2001 WL 1636430 at *8 (N.D.Ill. Dec. 20, 2001); 3Com Corp. v. Electronic Recovery Specialists, Inc., 104 F.Supp.2d 932, 941 (N.D.Ill. 2000). "Generally, the lack of an adequate legal remedy is the essential prerequisite to an accounting claim." 3Com Corp., 104 F.Supp.2d at 941. In the instant case, the complaint in general, and Count V in particular, fails to plead an inadequate remedy at law. In fact, Donnelli has pled a viable breach of contract claim as well as tort claims arising from the same set of operative facts on which he bases his accounting claim.

In his response brief, without reference to an allegation in his complaint or authority for such argument, Donnelli argues that defendants "owed Donnelli fiduciary duties once an agreement was reached whereby they would jointly develop and launch the Peters Securities' TMM operation." Donnelli's complaint is devoid of any such allegation and there is no support for such an argument in Illinois law. See generally, 3Com Corp., 104 F.Supp.2d at 941 (buyer who relied on seller to accurately report amount and value of scrap it removed from buyer's facilities for resale did not have fiduciary relationship with seller for purposes of establishing claim for accounting under Illinois law: "This was a contractual relationship not a fiduciary relationship"). The court further notes that dismissal of Donnelli's accounting claim "is of little negative consequence to plaintiff ... as the information [he] seeks in the accounting claim will likely be revealed during the discovery phase of this case." Id. at 942; Firstar Bank, 2001 WL

1636430 at *8. Accordingly, the court grants defendants' motion to dismiss Count V of the complaint.

## CONCLUSION

For the reasons set forth above, the court: grants defendants' motion to dismiss Count I against the individual defendants and against Peters Securities as to any claim arising from the termination of the alleged oral contract and any claim for post-contract termination profits; denies the motion to dismiss Count I against Peters Securities as to any potential breach of the payment terms during the period between February 1998 and February 2000; grants defendants' motion to dismiss Count II against all defendants; grants in part and denies in part defendants' motion to dismiss Count III; consistent with its ruling on Count I, denies defendants' motion to dismiss Count IV; and grants defendants' motion to dismiss Count V in its entirety. To clarify, remaining before the court is plaintiff's breach of contract claim alleged in Count I against Peters Securities for failure to pay the agreed upon profits percentage between February 1998 and February 2000, plaintiff's tortuous interference with contract claim alleged in Count III arising from individual defendants' Reuben Peters, Randle, Stoycha and Perhacs alleged conduct causing Peters Securities to fail to pay the agreed upon profits percentage between February 1998 and February 2000, and Count IV against Reuben Peters, Randle, Stoycha and Perhacs for intentional interference with prospective economic advantage. All claims against Robert G. Peters, C. Timothy Vlahos, Steve Helms and Christopher Rosman are dismissed.

Plaintiff is directed to file an amended complaint conforming to the court's ruling herein on or before September 18, 2002. Defendants shall respond on or before October 9, 2002. The parties are directed to file a joint status report using the court's form on or before October 9,

2002. This matter is set for a status report on October 22, 2002, at 9:00 a.m., at which the court will set a definitive discovery schedule.

**ENTER:** **August 28, 2002**

**Robert W. Gettleman**
**United States District Judge**